The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and the Republic for which it stands, one nation, under God, indivisible, with liberty and justice for all. Be seated, please. Good morning, ladies and gentlemen. Because of a rescheduling issue, we only have two argued cases this morning. The first is a patent case. The second is a trade case. The first is GlaxoSmithKline v. Banner Pharma. Case number 13-15-93. Ms. Maynard, I understand that you want to reserve three minutes for rebuttal. Is that correct? Yes, Your Honor. Okay. You may begin. May it please the Court, Deanne Maynard for the defendant. The patentees here claimed more than just a Tasserad. They also claimed all pharmaceutically acceptable solvates thereof. But the patent doesn't disclose that they actually invented any such solvate. That violates the written description requirement. Okay. Can I ask you to just double check something? As I understand, there's nothing in your statement of issues or in any of your headings that says that if the written description adequately describes solvates, it nevertheless doesn't adequately describe pharmaceutically acceptable solvates. Our position is that it doesn't adequately describe the claim, Your Honor. So our position is that it needs to describe pharmaceutically acceptable solvates. We just don't challenge the district court's definition or construction of pharmaceutically acceptable. But it is important that they claim pharmaceutically acceptable solvates. That confirms that we're right, that there's no description of solvate, because that's functional claiming. Well, that actually gets to the central thing that I'm thinking about. It seems to me, and just tell me why this is wrong, that under your definition of solvate or the other side's definition of solvate, it is a term that is broad but perfectly well-defined as a combination of structure and product by process. It's not a functional term. It is anything that results of a complex between solute and solvent coming out of the process of being in solution. That, as far as I can tell, does not involve any performance property, any functional term, unlike every other written description case that you cite and that has imposed limits. Except what they've claimed, and I think this is what your question is getting to, which is important, is they've claimed pharmaceutically acceptable solvates. Right, but nothing in your argument in the brief says there's something problematic about not identifying which of the solvates is pharmaceutically acceptable. You say there's no crystal, there's no precipitate, there's no reactive one or something, or maybe if there's only one, there aren't all three, but I don't think there was anything in your argument that said, even though there is enough described here to cover the class of solvates, all three forms in their view, one form in your view, nevertheless there's no description of which ones are pharmaceutically acceptable. And I took it that the absence of that focus was a kind of cautious avoidance of raising worries about the unbelievably common claim language about pharmaceutically acceptable salts, and you didn't want to get to that. No, Your Honor, I think our brief does argue that the pharmaceutically acceptable portion of their claim bolsters our argument because it is the portion that the district court's findings show that that's the unpredictability part. The unpredictable part is whether or not, so the district court's findings, the district court found that solvates can be unpredictable and how they will form is unpredictable, and the district court found that in order to be pharmaceutically acceptable, solvate has to be bioavailable. And the district court found that you can't tell whether it's bioavailable until you have it. And so it is the unpredictable part that makes it hard to... Right, but you don't, to follow up on Judge Toronto's question, you don't argue that it's because a particular solvate might not be pharmaceutically acceptable. Your argument, at least as I read the brief, is that they don't claim a solvate at all. Well, I think we're making both arguments, Judge O'Malley. One is there's no solvate at all, and we say this at times in our blue brief, and certainly in our applied brief, that there are no solvates at all, and especially no pharmaceutically acceptable solvates disclosed in the specification. And that's true regardless of how you define it. But if you define it, but one way to resolve the case is to say the district court misconstrued solvate as having some special meaning, which there's no special meaning given it in the patent. That ambiguous sentence doesn't mean what the district court read it to mean, and that certainly doesn't clearly give it a special meaning. Okay, so to the extent that there are, say, 20-some known solvates, is it your position that some of those are not pharmaceutically acceptable? Defining, Your Honor, is not that there are 20 solvates. The finding is that there are 20 solvents that could create solvates. That would make many more solvates, an unknown number of solvates, and we wouldn't know how many of them would be pharmaceutically acceptable. Nothing in the patent discloses that they actually invented any solvates, much less a pharmaceutically acceptable one. So there's no disclosure in the patent of any solvate at all beyond those two general descriptions which could have been lifted from any kind of treatise about solvates. What's the explanation for what you said about—this is a chemical question, not a legal question— 20 solvents, many more solvates with the same solute? Can you explain how that—this may be an embarrassing question, but I need to ask you that anyway. Well, because the solvents can interact with the organic compound in many different ways to create many different types of solvates. Depending on what temperature? Depending on the way that it's extracted from the liquid, depending on all sorts of different things. And then indeed, as Dr. Byrne, their expert, admitted in a testimony, we have a footnote in our reply brief saying that he also admitted that it's not just 90-20 solvents but mixtures of solvents and mixtures of solvates, and you could create many different solvates out of that. And the district court's findings support that notion. The district court found that similar chemicals can create many different solvates. So there's not a one-to-one correlation between you take an organic compound and a solvent and you're only going to get one possible solvate. Right, and what testimony is there in the record that of those potential solvates that some subset of them would necessarily be not pharmaceutically acceptable? Well, the district court made findings to that effect, Judge O'Malley. So the district court's findings, like starting at findings 15 on page A15 down to like 21, the district court found a pharmaceutically acceptable solvate that is suitable for use does not need to meet all the requirements of a finished drug product. Okay, fine. But then he says the suitable for use requires a solvate to be safe and to offer some therapeutic effect. Finding 21, it can be difficult or even impossible to predict whether a particular solvate form will offer bioavailability prior to the solvate's actual formation. So the district court actually found that the formation of solvates is highly unpredictable and you can't know whether or not any particular solvate, even if created, will be bioavailable until it's actually created. But there's no evidence in the specification at all that they had actually possessed any solvate at all. Is it your position that they actually had to have an example listed in the written description? No, your law is clear that you don't have to have it. But as this court said in Boston Scientific, the lack of an example can be telling. But there's nothing. The experts agreed that the kinds of tests an expert would use to show that they had actually invented a solvate, but none of that data is in this patent. GSK's expert has a patent that has similar data in it. Nothing like that is in here that would disclose that they actually possessed any solvate at all. It's nothing more, what they have in here is nothing more than a wish or a plan that they think that because they have this organic compound, that it might make us a solvate. Well, it's more than a wish or a plan. I mean, the district court found, and you haven't challenged, that in fact the patent's enabled, that without even substantial experimentation, they would be able to make this finding and find the appropriate solvate. So it may just be a wish or a plan that may have some chance of success, but that doesn't make it a written description. That's the distinction this court noted in Ariad, between, you know, you could have compound A, and that could give enough information for a person with skill in the art to enable compound B. But if you haven't described compound B, you can't claim it. And with good reason, right? They could have written their claims to just claim what they actually invented. They could have written their claims to claim just Dutasteri, but they didn't do that. They tried to preempt the field also on all pharmaceutically acceptable solvates. And the district court's case law doesn't let them do that unless they disclose to the world, that they describe to the world that separate invention. And that's what they didn't do. There's just nothing in here under any definition of solvate that shows that they have a solvate. And in the district court, this whole finding is based on finding a, quote, reacted solvate in example 3D. Where do you define the line between what is sufficient for enablement, but what additional information is needed for written description? Well, this court has created no bright line rules, but there must be enough in the patent for a person of skill in the art to be assured that they actually have invented what they're claiming. And as I said, the experts agreed what kind of tests one of skill in the art would do to identify that they had a solvate. And there's no information like that in here whatsoever. Just completely general boilerplate statements about solvates. None of the examples show it, and none of the descriptions show it. They don't say, they don't give any indication of what solvents you should use to get a pharmaceutically acceptable solvate. Nothing. No information at all. So whatever the answer is to how much... So you're saying even if it's the simplest test, and everybody knows that you can go from point A to point B on a simple, quick, easy test, they have to describe that test in the patent. Well, we know that's not our case because district court made findings that it's highly unpredictable, the creation of a solvate, and that not every solvate will be pharmaceutical. Highly unpredictable in advance, but easy to check after you've made something. But that is an enablement question, Judge Toronto. And that's where the district court's written description analysis went awry. So he made these findings that it was highly unpredictable, that you couldn't know whether it would be therapeutic unless you knew it was bioavailable, and that you couldn't know whether it was bioavailable until you actually created it. But not to worry, because once you do create it, you can test it, and when you test it, you can figure out whether or not it's bioavailable. But that's an enablement analysis. That's not a written description analysis. So the fact that you might be able to test it after you have it and figure out whether or not it's pharmaceutically acceptable does not describe it sufficiently in the specification to show one of skill in the art that you actually invented it. But those skilled in the art of organic chemistry appreciate that many organic compounds can form complexes with solvents in which they are reacting from which they are participated or crystallized, says the specification. Will appreciate that they can. Right. I mean, I think will appreciate that they can, but not that we have. Right? I mean, that's something that you could read in a college textbook. That's not a description to one of skill in the art that I have invented a pharmaceutically acceptable solvate of tetrastrate. Sorry, you're not arguing that the they in that passage refers only to organic compounds? Because that's what I took out of your brief. Oh, I'm sorry. Maybe I misunderstood your question, Judge Wallach. Yes, I do think that they in that passage means organic compounds. But it doesn't refer to complexes with solvents? Because it sure, grammatically, it sure seems to to me. What that sentence says is that it explains where the solvents come from to create the complex. So as the patent goes on and describes the preparation of organic compounds in the next section, it talks about all the different processes that one might go through to actually form and isolate an organic compound. And those can include reactions, crystallization, precipitation. And those also involve solvents. And so through that the solvent can hang around and form in the crystal lattice of a complex. And that is known as a solvate. So the way that I think this sentence is properly understood in the context of the art and the patent, and those of skill in the art, of organic chemistry, which is what they say as a person of skill in the art, is that it would form a crystal lattice, a crystalline form of solvate. And I think that's bolstered by the very next paragraph, which assumes that you're talking about crystalline forms. And in drug compounds you are talking about solids. You're talking about crystalline forms. And they say that someone will appreciate that there will be more than one crystalline form. So we're making clear, everyone knows we're talking about crystalline forms, and we just want to make clear that there might be more of them and we're claiming them all. Okay. You're into your rebuttal time. We'll restore your full three minutes and we'll give Mr. Lee an extra two minutes on his time. Thank you very much, Judge O'Malley. Okay. May it please the Court. My name is Bill Lee and together with Sarah Fraser I represent GlaxoSmithKline. Let me go directly to the remaining issue. It's a narrow issue. At trial, all of the anticipated attacks, anticipation, obviousness, lack of utility, enablement were brought to bear on this patent. A written description attack was brought to bear. All that remains is written description, and it's a narrow written description issue. There is no dispute that dutasteride is described. There is no dispute that dutasteride is the key to the invention. And there is no dispute that dutasteride is a common structural feature. What do you mean about there being no dispute about dutasteride being the key to the invention? That is the finding that was made by Judge Andrews, and that finding has not been challenged as clearly erroneous or erroneous in any respect by the defense. Tell me what it even means. Your Honor, it actually, if you consider this Court's law and the Patent Board's law, when you look at a new chemical entity compound and you take pharmaceutically acceptable salts, for example, as Your Honor alluded to, or pharmaceutically acceptable solvates, or salts or solvates, the central portion of the invention is the new chemical entity, the operative pharmaceutical. And it's important in this context, if you consider the District Court's finding for this reason, he found correctly that the complexes that Judge Wallach just referred to are non-covalent bonds between dutasteride and solvents. Those non-covalent bonds allow dutasteride to remain dutasteride. The therapeutic compound remains itself even in solvate form. That's what allows it to be administered to patients. In fact, as he said in his opinion, if you allowed dutasteride to form new covalent bonds, you'd have a new compound and you'd defeat the purpose of having a solvent. The claim is that it has to be in combination with a pharmaceutically acceptable solvate because that, again, is what allows it to be administered to patients. So I mean, I understand that the heart of the claim might be one thing, but you still have to describe all aspects of the claim. Your Honor, there are two answers to that question. Let me get to the second part first. The second part first, which goes to a central dispute between us, is there is a working example of a pharmaceutical formulation in this patent. This is a case in which the patent describes the test, right? And then Example 3-D, Your Honor, if you look at Column 14, is one of four pharmaceutical formulations. That's what it's called. If you go to Example 3-D, this is a working example of dutasteride with two solvents. The defendant still mentioned it, but the two solvents, propylene glycol and water, are two of the nine, which are identified and known to one of ordinary skill in the art to be, safe for administration to human beings. So you have here, for pharmaceutically acceptable solvates, you have a solvate. It uses two of the solvents that the experts agree are on this very, very limited list of potential solvents, and it's described as a pharmaceutical formulation. That, and when you put that together with the fact that the patent is conceded now, or at least the enablement decision has not been appealed, that is sufficient to satisfy the written description. The experts agree there's a limited pool of solvents, but they don't agree on what that pool is. One says nine and the other says 20 or something like that. They are, and there are two important parts, and I want to come back to the first part of my answer to the previous question. Both of the experts were operating off of two treatises. They both agreed that these were the two most significant treatises. One of them had nine. It was actually authored by Dr. Byrne. One had a longer list, and a substantial portion of the cross-examination trial was going through that list and having the expert identify the ones that would be known to be pharmaceutically acceptable or safe. The two of them agreed on that, and the district court so found. And that finding, we think, is correct, but it certainly is not clearly erroneous. Whether it's nine or 20, it's a limited number. You have a written description of solvates. You have three different ways the solvates could be made. You have a working example. And then, in addition, you have the proof, the findings by the district court, that solvation, both solid state and in solution, has been known for 100 years, that the number of pharmaceutically or safe solvates is between nine and 20. And the process of making them and testing them for bioavailability takes a matter of hours or weeks. To go back to the first question, which I think implicates what Judge Toronto asked me about, about the key, Ariad says, and Ariad is actually re-articulating what was said by this court in Lilly, that you can provide a written description of the genus if you describe the common structural feature. The common structural feature of all of these solvates, pharmaceutically acceptable solvates, is dutasteride. And that's why this concept of the key becomes important. That's one of the differences between the Ariad hypothetical of claiming C, claiming A, B, and C, but only describing C. And what the Ariad court said is, well, if you describe C, and it would have been obvious to one of the ordinators how to get A and B, either as an intermediate or otherwise, you have enabled, but you haven't described. This is not that case. This is a case in which solvates, pharmaceutically acceptable solvates, solvates by reaction, precipitation, and crystallization have all been described in hot fervor, and the patent's enabled. There has never been a case at this court where the claim terms have been described expressly in words. There's been a working example, the patent's been enabled, and the patent's been found to be invalid. Do you need the working example? The answer is, Your Honor, no. The working example helps, but this goes to this question of what was the key to the invention. Dutasteride has been described explicitly. If I take the A, B, and C example of Ariad, the problem with the A, B, and C is, you've described in words or diagrams C, but you haven't described A and B. Here, the core is compound one, and that's Dutasteride, and the pharmaceutically acceptable solvates, or it's like a concept, as Judge Toronto suggested, like pharmaceutically acceptable salts. It's what one of ordinary skill in the art would recognize as the manner in which you deliver. There's one part that I think I'd like to unpack a little bit from the defendant's argument, and it's this, this unpredictability concept. The district court did not find that there was any difficulty or great hurdle to making, to identifying the 9 to 20 pharmaceutically acceptable or safe solvent to making the solvates. Both experts testified it would take only a matter of hours or days. The only unpredictability findings that they rely upon are the question of bioavailability, after the solvent's been made, and that's where the district court found, and we say it's correct, but we certainly suggest it's not clearly erroneous. That's where the district court found that it would only take a matter of hours to determine which were bioavailable and which were more bioavailable than others. When you have the words describing solvates explicitly, when you have an example, an example that describes a pharmaceutical formulation and all of this, that's sufficient to satisfy the written description requirement. And the consequence is this. The reason that the defendants have to dismiss example 3D, their claim basically is you need a working example. To answer Judge O'Malley's question, we say that that's not correct. You don't need a working example, but we have one. It's example 3D. So then the issue that's joined now as this case gets narrower and narrower is this. Is this a working example? It's in the patent. It's described as a pharmaceutical formulation. It has two of the nine solvents, and it's in the solution. So what did they say? They say three things. They say first, it's not an example because a correct claim interpretation is limited to crystalline solvates. The answer to that question is no, the claim interpretation is not so limited. But even if it were, and this goes to your question, Judge O'Malley, crystalline solvates are described in Column 3 and Column 4. Their next argument is, well, and this is the hardest one, at least the most difficult one for me to get my head around. The next effort to dismiss it is to say, well, that isn't a reaction. A reaction has to be something that creates covalent bonds, and this doesn't create covalent bonds. Well, there are only three answers to this reaction argument. The first is the district court found that Example 3D produces a solvate expressly, and it's not clearly erroneous, and he was correct. It's a solvate in solution, and the patent at Column 11 specifically describes administering the test right in solution to patients. So their whole argument that Example 3D doesn't fit, Can I get back to this crucial language, which maybe you can help me walk through? The sentence that everybody is talking about from the spec in Column 3. So those who are in organic chemistry will appreciate that many organic compounds can form complexes with solvents in which they are reacted. So in there, it's the organic compound that's doing the reacting in the solvent to form the complex, or from which they are precipitated. So it better be the same thing. Namely, the compound has to be precipitated from or crystallized in the solvent. That seems to me the plain grammatical structure of this. I'm not sure that's consistent with what you're saying, but tell me if it is. It is, and Your Honor, actually, if I would ask the court to carefully consider what they say in their briefs, and I think you'll see what the issue is. We agree. We're referring to the organic compounds. And I'd like to make two points. Let me go through the grammatical point first, reading the sentences. But then, I urge Your Honor, I don't think you can just read these in isolation. You have to read these sentences against Column 11, which specifically describes solvates in solution. I get the relevance of 11. Partly because the district court, in its opinion, at A5 and A7, talked about the complex doing reacting, but then adopted a construction, your construction, which talked about the compound, namely the casserite, doing the reacting. It felt to me like there was some genuine confusion about what was doing the reacting, what was doing the precipitating, what was doing the crystallization. And I'm finding it, I guess, important to understand the reality that's going on here to understand what this sentence is doing. I think the way that we read it, and I think the way that, if you take the district court's two opinions together, Judge Andrews read it as, Many organic compounds can form complexes with solvents. So you have organic compounds and solvents. The organic compounds exist already. That's the key. Our position is the they refers to the organic compounds, but they exist at the time that they're reacted with the solvents. That they are either... Let me just stop you there. And by react there, you include what? The reaction, this is what the proof was at trial, and this is the evidence on which Judge Andrews based his testimony. It includes for sure the creation of new covalent bonds. And in fact, columns five and seven, in describing how you make the test right, it describes that. But the expert testimony at trial, and the expert testimony that Judge Andrews credited was, that when you form non-covalent bonds, heat can be released. And if heat's released, that's an indication that there has been a reaction. And that this patent uses the word reaction to describe both the formation of new covalent bonds, and the formation of non-covalent bonds through a reaction that releases heat. And Judge, Dr. Burns specifically testified to that, and the district court specifically credited it. So this piece of the sentence is about the organic compound reacting with the solvent to form a complex. To form a solvate, yes, a complex. Yeah, the complex. Okay, and what about the rest of it? And then it says, from which they are precipitated or... That better be the same organic compound. It's the same organic compound. That's what's being precipitated, not the complex. It's being precipitated from the solvent. But I thought... Isn't it... I'm sorry, I thought it's the complex that's coming out. Yeah, that's... Your Honor, to get to the next thing, it says these complex are known as. So it's... I'm not going to tell you that this is 100% model of clarity, but that's why the explanations that the district court got from the experts were critical. And what the district court concluded correctly, both on claim interpretation as a matter of the evidence, is that the organic compound is to test, right? It's something that exists. That you can react, precipitate, or crystallize, and create non-covalent bonds. And those are these complexes. And the key, Your Honor, is, if you look at the next two sentences, these complexes are known as solvates. For example, a compound with water is known as a hydrate, right? That's water as a solvent. And just as a technical matter, does the hydrate have to still be in solution? It can be either. And that was the evidence before. It can actually be a solid particle that comes out of the solvent and still be a hydrate, because you've now got some water in it in some way. The evidence at trial was that you could create it in liquid form and the pace at which you cool it could determine whether it was amorphous or crystalline. And depending on which one it was, you might characterize it as precipitated or crystalline. I think the critical point here is, the claim term is pharmaceutically acceptable, solvate. Solvates of dutasterate are described in express terms. There are different forms and different ways to get there, but that doesn't change the claim term. And when you have a situation where the claim term is described expressly, is described in different forms, it's described as in solution and solid, it could be both, that there are descriptions in the patent of administrations that are in solution. Let me ask you, I guess, a version of the question that I started with Ms. Maynard with. I actually thought that your case was easier if one ignores the pharmaceutically acceptable portion, because then the term solvate doesn't have any performance property in it. Performance property is something that I need to be functional. And every one of the written description cases where we've imposed limits on claiming something of the form, anything that has the following property, but we don't actually know either a structurally definite element, definition of it, or a product by process kind of thing, that this seemed to be a combination, actually, of structure and product by process. But then it seems to me when you introduce pharmaceutically acceptable, you've now introduced a performance property. Your Honor, I think the answer is twofold. And respectfully, the first part is, it's important to view the context that gets us here. This has been a little bit of a moving target. The focus at trial was on solvate, not pharmaceutically acceptable. And if the Court considers Judge Andrews' opinion at page A23, you'll see that the focus of pharmaceutically acceptable at trial was their definition that required it to be ready-for-manufacture, FDA-approval delivery of patients. When you look at the initial brief that was filed for this Court, the focus is on solvates. That was the focus. That is the focus. That is described. But even if you inject pharmaceutically acceptable into it, we think that there are three answers. Do test right is still the key, number one. Number two, example 3D using propylene glycol in water is an example. And then number three, Your Honor, if you take the fact that solvates in solutions and solvates in solids crystalline form are something that's been known for 100 years. Put aside your 1913 article and putting aside fair testimony unsupported by objectively viewable documentary support. What do you have to support the notion that in the pharmaceutical context a term is used to cover your in-solution versions? Your Honor, first there is the testimony that describes. Let me focus you on two things. One is there is, and I know I'm over my time, so if I can answer this question. This distinction between solvates in solution and solvates in solid form, there were five people who testified, including their expert. And it's a distinction without a difference. This was an artificial distinction that was basically ginned out the trial to try to limit the claim to crystalline solvates. So it's a distinction without a difference. The second part of the answer is this. In the past itself, it tells you that there are solvates in solutions. That's what's being described in example 3D. The response from the defendants is, no, no, no, no, all of what you talk about, the references you're referring to in the solution are inorganic compounds. That's what they said in reply. That is simply not true. And I would draw your Honor's attention to A10094. And you'll see the Tremillion reference, which describes solvation of organic compounds in solution. You'll see it specifically talks about large organic ions and dilution in an aqueous solution. And then I would draw the court's attention to A4644, line 13, to A4645, line 4, where their expert conceded that a hydrate can be a compound solvated in solution. So if their expert, I mean he conceded, this is I guess partly why I asked you the question. I thought you answered my question about whether a hydrate can be a solvate that can be outside solution. You know, a physical thing as opposed to a liquid. It can be both. So does the expert actually concede that this hydrate can be a solvate regardless of whether it's still in solution or whether it's come out of solution? I think, Your Honor, if you read his testimony in context, you'll see that we're talking about in solution. His precise testimony is, and this is on cross-examination, I believe that knowing a hydrate could form with an interaction of water in an inorganic molecule had been known for a very long time. That was a cross-examination directed at his testimony that you should focus just on solid-state chemistry. I think an important part of this is, and I'll finish because I know I'm way over my time. You're going to have to wrap up. You're way over your time. Last sentence. This is all evidence and all witnesses that Judge Andrews had an opportunity to hear, to evaluate, and to credit. And the written description findings of fact upon which he bases his opinion are the result of his hearing and crediting that testimony. Thank you, Your Honor. Okay. We'll give you five minutes for the panel. Thank you very much. Try to keep this fair. Your Honor, I'll try to be brief. Can you answer the last point, though? I mean, we are under a clearly erroneous standard of review here. You've got a pretty big uphill battle, don't you? No, Your Honor, it's not a clearly erroneous standard of review. The first three questions we present in our brief are all legal questions, legal errors, claim construction errors. The colloquy that Judge Ciancio was having with Mr. Lee is all about the proper meaning of the word solvate in this patent, and that's a claim construction issue that this Court reviews de novo. Well, assuming that we disagree with you on the claim construction issue, the question of whether or not there's sufficient written description, that is a fact question. Ultimately, it is a fact question, Your Honor, but there are legal errors that led the District Court to where it got. And if we end up with a clearly erroneous fact question, I think it's clearly erroneous to find that there's any solvate described in Example 3D. There's no evidence in Example 3D that it's anything other than dutasteride dissolved in a solution, which is nothing but the compound, the dutasteride ore is the first part, dissolved in a formulation suitable for administration to a patient. And that Example 3D was in the patent before they ever added solvate to the patent. You know, the claims claim dutasteride with a pharmaceutically acceptable solvate thereof. No, Your Honor. The claims claim dutasteride or a pharmaceutically acceptable solvate thereof. And so under Boston Scientific, they have to describe and have sufficient written description for both dutasteride and a pharmaceutically acceptable solvate thereof. And dutasteride is not enough. Describing and enabling dutasteride is not enough. I understand that, but that wasn't my point. My point is that the trial court made specific findings that the uncontradicted evidence is that there were known solvents, that there were solvents known to be safe for a person skilled in the art to choose from in 1993, that it would be routine for a person skilled in the art to select the solvent to make a safe solvate. So how is that not sufficient to satisfy the pharmaceutically acceptable solvate description? If they describe the fact that they are making solvates and they were known in the art at the time, isn't that enough? No, Your Honor, because at findings 20 and 21, the district court finds that solvate formation within a series of related compounds tends to lack a discernible pattern, with each compound having a unique response to solvate formation. And it can be difficult or even impossible to predict whether a particular solvate form will offer bioavailability prior to the solvent's actual formation, and that is key. Because here what they have claimed is pharmaceutically acceptable solvate, and it's the difference that matters. So Mr. Lee says, well, but dutasteride is the common structural element. Dutasteride is part of a solvate of dutasteride, but the different part is the part that drives the unpredictability and that drives the uncertainty and is the part that needs description. And it isn't described in this patent. To your point, Judge Taranto, the patent says that the appropriate skill of the art is organic chemistry, and their experts, pre-litigation writings, 160 articles, all describe and define solvate as a crystalline complex. And so they have searched high and low and they have found four references that they claim support their solvate-in-solution theory, one being from 1913, two others showing inorganic references, and I do think the page he points you to in Tremillion is inorganic compounds. And the fourth one being haliblein, and haliblein is the one with the beakers which supports our interpretation. And hydrated ions are not hydrates. The hydrate is in the beaker C with the solid. And there's a difference between being hydrated and a hydrate. And it's a form of wordplay. And once the claim construction is corrected, there is no description in this patent of any pharmaceutically acceptable solvate. Judge Taranto, just in... So I just wanted the example 11-D about the propylene glycol in water. You say there is no solvate there because there's no crystal complex form or because it's still in solution or what? It just says that they've dissolved dutasterate. It's just a dissolution. There's no... So if you accept our definition, yes, there's no crystal in form disclosed at all. And just to be clear, your definition excludes crystals that are still in the solution? Dissolved. There are no... Again, I may be confused about an underlying merit. Can you have a crystal that's still in the solution before it comes out of the solution? I think what comes out of the solution is the crystal, Your Honor. When it's dissolved, you have dutasterate... Doesn't it have to form in the solution first? And then come out of it? I would need no. I'm told no. My understanding of it is when it's dissolved, the water circulates around it and it's in a fluid state. It's crystallized out. And when it's crystallized out, that's where you might get the hydrate. And the beakers that we show from the Halidnian reference, I think, explain the process fairly clearly. If I could just make two quick points about the sentences in your exchange with Mr. Lee, Judge Toronto. Very quick. Yes, thank you. Thank you, Judge O'Meara. The sentence, an organic compound, I think the difference in what he's reading those sentences and we're reading those sentences, he's reading the organic compounds to be completed dutasterate. But it's plural. It's organic compounds generally. And it's important to know that organic compounds would be precursors to the ultimate dutasterate. And our understanding of that sentence is the precursor organic compounds that might, in their formation, enter into complexes. And then, Judge Toronto, to your question to me, I would point you to our blue brief at pages 35 to 36 and 39 to 41. And then our reply brief at page 25 where we clearly emphasize the pharmaceutically accessible solvay. Thank you very much for your patience. Thank you.